IN THE

# COURT FOR THE CORRECTION OF ERRORS

OF THE

## STATE OF NEW-YORK,

IN DECEMBER, 1846.

---

### McCullough *vs.* Moss.

The right of a corporation to make a promissory note in the transaction of the business contemplated in its charter is recognized by 1 *R. S.* 768, § 3. But it must affirmatively appear that it was made in the course of its legitimate business : the fact will not be presumed.

A corporation cannot be bound by its agents for acts not within the powers conferred upon it by its charter. Contracts based on such acts are void, and a subsequent ratification by the directors will not render them valid.

The authority of agents of a corporation must be shown. Proof that a promissory note purporting to be made by it was signed by the president and secretary, is not sufficient without proof of their authority to sign it. *Per* LOTT, *Senator.*

A resolution passed by the stockholders of a corporation does not bind it. It can only act in the manner provided by its charter. *Per* LOTT, *Senator.*

The provision in the act incorporating the Rossie Lead Mining Co. (*Laws of* 1837, *p.* 396,) rendering the stockholders liable for its debts, is applicable to persons owning stock when the suit is brought, and not to those who were stockholders when the debt was contracted. *Per* ~~Lott and Van Schoonhoven, Senators.~~ BARLOW and TALCOTT, *Senators, contra.*

The opinion in *Moss* v. *Oakley,* (2 *Hill,* 265,) and *Moss* v. *The Rossie Lead Mining Co* (5 *id.* 137,) disapproved. *Per* LOTT, *Senator.*

(567)

McCullough *v.* Moss.

ON error from the supreme court. This was an action of debt, brought against the plaintiff in error as a stockholder in the Rossie Lead Mining Company, upon a promissory note dated October 9, 1839, for $4050, made in the name of the company and payable one year after date, to the order of Moss and Knapp, and by them endorsed and negotiated to the defendant in error upon an existing indebtedness. The cause was first tried at the St. Lawrence circuit in July, 1842, and upon a bill of exceptions a new trial ordered at the May term of the supreme court in 1843. (*See* 5 *Hill*, 131.) It was again tried at the same circuit in July, 1843, before the Hon. JOHN WILLARD, circuit judge. The plaintiff below proved the signatures of the president and secretary of the company to the note, and that the president was also its general managing agent : a judgment by default thereon against the company in his favor, and the return of an execution unsatisfied. He then offered in evidence a letter written by the secretary of the company dated October 6, 1839, to one Lewis Moss, containing a copy of a resolution passed at a meeting of the stockholders of the company, that it was expedient for the company to contract with Moss and Knapp for the purchase of their smelting works, tools, machinery, and certain other property, including the use of a patent and some apparatus for smelting lead, which Moss and Knapp owned. The reading of this was objected to, 1st, because it was the resolution of the stockholders, and not of the officers of the corporation ; and 2d, that such a resolution could only be proved by the record of the company's proceedings. The objection was overruled and the evidence admitted, and an exception taken. The plaintiff then offered in evidence the records of two judgments recovered against the company by default upon promissory notes signed by the president of the company, dated October 30, 1839. The evidence was objected to by defendant's counsel, 1st, as impertinent to the issue ; 2d, that the defendant was not a party to those records ; and 3d, that he was not a stockholder in the company when the judgments were recovered. The circuit judge overruled the objection and admitted the evidence, and the defendant's counsel

McCullough *v.* Moss.

excepted.   The plaintiff then offered the note in evidence, and the defendant's counsel objected, because no authority in the president and secretary to make promissory notes in the name of the company had been shown.   This objection was also overruled, the note read in evidence and an exception taken. The plaintiff here rested, and the counsel for the defendant moved for a nonsuit, because, 1st.  The plaintiff had not proved an organization of the Rossie Lead Mining Company; 2d.  He had not shown any authority to give the note; 3d.  He had not proved any consideration for it, nor that it was given in the ordinary business of the company; and 4th.  The officers of the company could not give a note on time which would hold the defendant as guarantor.   The circuit judge overruled each of the objections and denied the motion, and the defendant's counsel excepted.   It was then shown that the note in suit was one of four notes given to secure $15,000 and interest, to be paid by the company upon an agreement made by it with the payees, Moss and Knapp, on the 9th of October, 1839, which fact was known to the plaintiff when he became the holder of the note, and that he took it upon a precedent debt from Moss and Knapp.   By the agreement, Moss and Knapp sold the company a lease from George Parish, covering about 50 acres of land in Rossie, a portion of which was used for agricultural purposes, and upon which was erected a smelting works, eighteen or twenty small houses for workmen, a store, and a building originally built for a dwelling, but then used as a school·house; their interest in a contract with Parish to wash and smelt lead ore; their interest in a contract with Fitzhugh and Vandewater for the transportation of freights to Oswego, Utica, Albany and New-York; the use of a patent right for a smelting furnace, a three acre lot with a dwelling house upon it, and a quantity of personal property specified in an inventory annexed, among the items of which was a threshing machine. They also relinquished a claim which they made against the company upon a contract entered into with the original stockholders on the 12th of September, 1836, (being some time prior to their becoming incorporated,) for smelting lead ore.   This

McCullough *v.* Moss.

claim, amounting to about $10,000, the company had not recognized. It was further shown that the property sold the company under and by the agreement, was taken possession of by it and used until its failure, when a portion was sold on execution by the sheriff, and the remainder went into the hands of a receiver appointed by the court of chancery; and that the price of $15,000 paid for it was made up without including in the amount any thing for the claim for damages, the patent right or the threshing machine. These were thrown into the bargain, because the company insisted upon it. The circuit judge charged the jury that the plaintiff was entitled to recover the amount of damages recovered against the corporation, excluding the costs of that suit. The counsel for the defendant requested him to charge, That the plaintiff was *not* entitled to recover, for the same reasons which were stated on the motion for nonsuit, and also, because, 1st. The consideration of the note was illegal, and not within the corporate powers of the company; 2d. The defendant was a guarantor for the debt of the company, and entitled to hold its agents strictly within the bounds of their authority, and the evidence showed an unwarranted exercise of authority in the purchase from Moss and Knapp, of which fact the plaintiff had notice; and 3d. A part of the consideration of the note arose before the defendant became a stockholder of the company. This request the circuit judge refused to grant, and charged the jury that as matter of law the reverse of each of the propositions was true; and the defendant's counsel excepted. The jury found for the plaintiff $4780,90. Upon the argument of the motion for a new trial on the bill of exceptions, the opinion of the court was as follows:

NELSON, Ch. J. In the first place the evidence in the case shows that the claim for damages upon the smelting contract constituted no part of the consideration money for which in part the note in question was given. The $15,000 was given for the interest of Moss and Knapp in the smelting works and appurtenances. This was the estimate of the value at the time,

McCullough v. Moss.

and, as appears, no more than the property was worth in cash. This evidence in no way contradicted the written contract of purchase, but was entirely consistent with every part of it. There were mutual claims for damages between the parties at the time, growing out of the smelting contract. On the one side, for non-compliance on account of the impurities of the ore delivered; and on the other, for not going on and smelting the article as stipulated. These claims were mutually given up and cancelled, without being taken into the account in putting a valuation on the property. The fact of the existence of these contested claims for damages and other difficulties growing out of the contract may and probably did form an inducement to the sale and purchase of the apparatus on both sides. But that of itself cannot be regarded as part consideration of the purchase within the sense of the term as contended for here. It constituted no part of the purchase money of the property sold and delivered to the company. Indeed, in looking at the ground of the claim put forth by Moss and Knapp, in connection with the contract, it is quite difficult to see any foundation in law for it. But in the next place, if it did, I am inclined to think that these inchoate disputed claims arising out of alleged breaches of the smelting agreement, in the course of its execution did not constitute any debt or demand against the company within the meaning of the charter in this particular until adjusted between the parties, either by amicable arrangement by the competent parties or by suit. It was a claim sounding in damages for breaches of the contract, occurring and running through a period of some year and a half, and would not and did not assume the form or nature of a debt, in the strict legal acceptation of the term, until adjusted by the arrangement in October, 1839. It was then also a claim entire and incapable in law of being severed and apportioned according to the several periods when the breaches may have occurred, if at all. It became a debt or demand against the company, in the sense of the statute, when the adjustment took place and not before.

All the other questions in the case will be found considered

and disposed of when this one and the suit against the company were formerly before the court. (5 *Hill,* 131, 137.) New trial denied.

*J. Van Buren,* for the plaintiff in error, urged the several points contained in the exceptions taken upon the trial, and insisted that the assumption by the company of the agreement between Moss and Knapp with Fitzhugh and Vandewater, and the purchase of the patent right to use the smelting apparatus, were each without the corporate powers of the company, and the purchase of the three acre lot was prohibited by the statute in relation to corporations, (1 *R. S.* 599, § 1, *subd.* 4,) as the company was then possessed of real estate to the full amount of its capital; and that these questions should have been submitted to the jury.

*J. A Spencer & F. Kernan,* for the defendant in error.

Lott, Senator. After a careful examination of the act to incorporate the Rossie Lead Mining Company, (*Laws of* 1837, *p.* 441,) I have arrived at the conclusion that stockholders who were such at the time the debts due from the corporation were contracted, and they only, are liable for their payment. It was declared by the second section of the act that the owners of the interests under the lease and the supplemental agreement therein mentioned should be the owners of the capital stock in the proportion of their interests. They had, as appears by the contract of September 12, 1836, with Moss and Knapp, previously formed themselves into a stock company, and contracted for the smelting and sale of the lead ore they should obtain from the mines leased to them. In this state of their affairs, (which it appears to me very important to bear in mind in giving a construction to this act,) they became incorporated by the same name which the joint stock company bore, and for the specific term to which their rights of mining were limited by the lease. The act of incorporation does not, however, confer all the rights usually incident to a corporation. A very

McCullough *v.* Moss.

important privilege, exemption of the stockholders from personal liability for its debts, is denied them, and they are made severally as well as jointly liable therefor.

If the ninth section had only declared this personal liability of the stockholders and no provision had been made by it and the tenth section for suing them, I apprehend there could be no reasonable doubt that it applied to those only who were such at the time the debt was contracted. That is referred to and spoken of in connection with this liability. It is moreover the natural construction. The right of the creditor accrues on the creation of the debt. As a general rule he can only look for its payment to the individual contracting it. If credit is given, it is on his means and responsibility, and it appears to me that the intention of the legislature in securing the personal liability of the stockholder, was only to give the creditor the same security he would have if the company had not become incorporated. The latter part of the ninth and the tenth sections of the act impose no new obligation and create no new liability on the part of the stockholders, nor give any new right or security to the creditor. They only operate on his remedy to enforce and make available the right previously secured. It is declared that the creditor may sue *any* stockholder. There may be justice in giving him the election to sue either, one who was a stockholder when the debt was contracted or one who may have become so by a subsequent purchase at a reduced price in consequence of the outstanding debts at the time; but I cannot discover any principle either in the nature of the business or the objects of the incorporation, to justify a provision depriving him of a remedy against one owning stock at the time he gave the company credit, and limiting his right to seek satisfaction from a person who subsequently became a stockholder and to whose responsibility he never trusted. Such a provision would be unreasonable, and a construction which would lead to such a result should not be given to the act unless absolutely necessary to give it effect. And in my opinion it is not required, and would be inconsistent with its whole scope and design. The stockholders are declared to be liable

for the payment of all debts. As soon therefore as a contract is made, the liability attaches, and of necessity to the stock holders at the time, and this cannot be divested except by satisfaction of the demand. It is not strictly a case of guaranty or suretiship, where laches or indulgence by the creditor would operate as a discharge. It is a burden imposed on each stock-holder as one of the conditions of the charter, that he shall be a principal debtor for all debts or demands contracted by the corporation while he is a member of it. The object of the legislature was doubtless security to those dealing with the company, and the construction given by the supreme court is the only one which can fully and effectually carry out that intention. If their remedy were confined to those owning stock when suit was brought, or when judgment was recovered, or execution issued or returned, great facilities would be afforded for those who had derived the benefit of the labor or property for which the debt was incurred, in the increased value of the stock, or by the receipt of dividends, to avoid personal respon-sibility by transferring their stock in anticipation of a suit to enforce payment. A creditor would by that means be deprived of the security upon which it is reasonable to presume he relied when the credit was given, and be compelled to seek redress from parties who were unknown at the time and whom he might have been unwilling to trust. It is no answer to this view of the case to say that if a fraudulent transfer was made the liability would not be discharged, and that recourse might be had to the prior holder of the stock. Proof to establish such a fact is always difficult, and it is not just or reasonable to im-pose the necessity of furnishing it on a creditor. I am aware that this construction is not in accordance with the decisions of the courts of Massachusetts and Connecticut on statutes of an analogous character, referred to in *Moss* v. *Oakley*, (2 *Hill*, 265.) Without examining the reasons assigned for those decisions, it is sufficient to say they have no controlling authority. The principal case in Connecticut did not meet the unanimous approval of the court; and as was shown by Justice Bronson in *Moss* v. *Oakley*, the others are distinguishable from

McCullough v. Moss.

the present case. Assuming, then, the rule above adopted to be correct, it remains to be considered whether the defendant is liable under it for the debt in question. The suit is brought on a negotiable promissory note purporting to have been made by the Rossie Lead Mining Company, payable one year after date to the order of Moss and Knapp, and by them endorsed to the plaintiff. If the company were authorized in the exercise of its legitimate business to make it, the question is presented by the case whether its execution was proved. It is signed by J. Averill, as president, and D. C. Judson, as secretary; and it is shown that they were such officers at that time, and that Averill was also "general managing agent." There is, however, nothing in the nature of those offices as connected with the object and business of the company from which a general power to make notes could be implied. The affairs of the corporation were to be conducted by five directors, a majority of whom formed a board for the transaction of business, and a decision of a majority of those duly assembled as a board was requisite to make a valid corporate act. (1 R. S. 600, § 6.) The authority of the board to the president and secretary was therefore necessary to give validity to the note. This was not shown. The resolution passed at the meeting of the stockholders contained in the letter of the secretary dated October 6, 1839, could not bind the corporation, especially so as to affect the members not present. When a charter invests a board with the power to manage the concerns of a corporation, the power is exclusive in its character. The corporators have no right to interfere with it, and courts will not, even on a petition of a majority, compel the board to do an act contrary to its judgment. (Angell & Ames on Corp. 121 to 123, 151 to 164.) The stockholders as such, in their collective capacity could do no corporate act. The directors were their representatives and alone authorized to act. It is one of the fundamental conditions of the contract into which the corporators have entered by becoming members of the corporation, that its concerns shall be managed in the manner prescribed by the act of incorporation, and from this no essential departure can be made. But

if such a resolution properly passed were obligatory, and could have authorized the officers of the company to make the note, yet the objection to the proof was well taken. No original minutes of the meeting were produced, nor indeed was there any evidence that such a meeting had ever been held. The mere production of Judson's letter stating it, did not prove the fact. Nor were the two records of judgment against the company admissible as " persuasive evidence" of the authority of the president to make the note. They did not tend to that object. Both of the notes on which they were recovered were dated Oct. 30, 1839, twenty-one days after the note in suit. If they had been concurrently given, and for the same consideration as is stated to have been the case in Moss against the company, (5 *Hill*, 139,) they might possibly have afforded some color of authority, or at least fortified the other evidence of ratification, provided the suits had been actually and in good faith defended, although the position is very questionable. But a judgment " *by default*" in a suit which must be commenced by the service of the first process on the presiding officer, cashier, secretary or treasurer, if there be such officers, (2 *R. S.* 458, § 5,) and which, in the absence of proof of service upon the treasurer, I think it is fair to presume was commenced by such service, either on Averill the president or Judson the secretary, cannot, without it is shown to have come to the knowledge of the board of directors, have that effect; especially as against a defendant who was not a stockholder when it was obtained. It would in effect be establishing the principle, that one unauthorized act by the officers of a corporation would justify and legalize another. There was therefore no legal evidence of the execution of the note by the company, and the circuit judge erred in permitting it to be read. The proof afterwards introduced to show a subsequent ratification of the act, was insufficient to charge the defendant. To have rendered it available as against him, it should have been shown that the act was adopted while he was a stockholder. He sold his stock on the 10th of December, 1839, and the note was made the 9th of October previous. The principal circumstances relied on to show a ratification during the intermediate time are

McCullough *v.* Moss.

the use of the personal property, and the occupation of the real estate for which the note was given. That, however, was no evidence of a change of ownership. It was perfectly consistent with their prior relation to Moss and Knapp. The workmen who had been previously in their employment continued to work and occupy the premises as they had previously done. There was therefore no external change in the management of the affairs of the company. It is true one of the witnesses saw four of the directors at the works after the sale, and some of them there about the time it was going on. This cannot amount to a ratification. It is not inconsistent with the continuance of the smelting contract of September 12, 1846. But if it were not, the presence or indeed the active interference of individual directors would be inoperative and ineffectual. The concurrence of a majority of the board, when duly assembled, is requisite to constitute a valid act. The assent of the several members separately is not enough. (*Livingston* v. *Lynch*, 4 *John. Ch. Rep.* 596, 597.) The ratification of an unauthorized transaction can never be inferred from the acts of the very officers or agents by whom it was made. The assent or recognition of the principal must be shown. In any view of the case, therefore, I am of opinion that there was no proof either of the original execution of the note or its subsequent ratification. As however this defect may be supplied on a new trial, I will proceed to examine into its validity on the assumption that it was made by the authority of the board of directors.

The right of a corporation to make a promissory note for a debt incurred in the course of its legitimate business, although it is not expressly authorized to contract in that form, appears to be conceded in our courts. (*Mott* v. *Hicks*, 1 *Cowen*, 513; *Att'y Gen.* v. *Life and Fire Ins. Co.* 9 *Paige*, 470.) The power is indeed recognized by the revised statutes to exist in every corporation capable by law of making contracts. (1 *R. S.* 768, § 3.) But in the view I have taken of the case it is unnecessary to examine whether the Rossie Lead Mining Company had this power. I am satisfied that the note in question was given for purposes and objects unauthorized by its charter and therefore

not obligatory. It was incorporated " for the purpose of raising and smelting lead ore or galena, at Rossie in St. Lawrence county," with a capital of $24,000, divided between the members of the company of the same name, already formed and in operation. It is declared by statute, (1 *R. S.* 600, § 3,) that no corporation shall possess or exercise any corporate powers not expressly given in its charter or enumerated in the general powers given to all, except such as shall be necessary to the exercise of those so enumerated. The note in question was given for part of the consideration agreed to be paid Moss and Knapp for their transfer to the company of real estate and property to be used as an addition to its capital. Every corporation has the general power " to hold, purchase and convey such real and personal estate as its purposes shall require, not exceeding the amount limited in its charter." (1 *R. S.* 600, § 1, *sub.* 4.) That however does not confer an unlimited discretion as to the amount of property so to be held or purchased, even when there is no limitation as to it in the charter, especially when the business of the corporation requires a capital that is fixed and limited. It is always contemplated that the transactions of the company shall be limited to its capital. Each stockholder must be presumed to be influenced by the fact, and particularly so when he can be made liable individually for the company's debts. It is evident that the legislature, in granting special privileges to a corporation, do not contemplate that the capital shall be increased to an amount beyond that specified in the charter. That is made the basis of security for the satisfaction of the debts of the company, and no part of it can be withdrawn without the consent of the legislature. (1 *R. S.* 601, § 2.) There is an additional consideration, which appears to me conclusive on the question. The whole policy of our law requires that the entire capital shall be paid in in cash, so as to furnish a substantial security for the discharge of responsibilities incurred in its dealings. The company cannot receive any evidence of debt in lieu of cash, in payment of any portion of its capital, nor permit any part of the capital to be withdrawn. (*Id.*) The whole policy of these provisions would be evaded, if the trans-

McCullough *v.* Moss.

action under consideration were sanctioned. It appears by the act of incorporation itself, that the corporators were at the time of its passage the owners of certain rights, under a lease to discover and work lead mines at Rossie, for a specific period. The duration of the charter was limited to the same time. It is evident therefore that its operations were intended to be limited and restricted to the land in the lease referred to. No additional capital was authorized or contemplated. By the mode adopted, however, it obtains a property as an addition to its capital to the amount of $15,000, not by the payment of cash, but by incurring a debt for the whole sum, payable in four annual instalments with interest. And they were at perfect liberty to part with the whole of this the next day, without having paid a cent therefor, and divide the proceeds among the stockholders; and permit the vendor, as a creditor for nearly two-thirds of the entire actual capital, to come in and deprive to that extent, or at least in that proportion, the workmen and other bona fide creditors of their right to payment out of the capital; a result never anticipated by the legislature. So on the other hand, the liability of the individual stockholders might be increased far beyond the amount ever contemplated by them, without their receiving any benefit therefrom. If, however, I am mistaken in this view of the question, and the corporation had authority to make a purchase on credit of property deemed necessary for its legitimate purposes, yet I am clearly of the opinion that its powers were exceeded in the purchase of the farm, the three acre lot, the school house, store, and threshing machine. It had no authority to engage in agricultural or mercantile pursuits, or the education of youth. They were all very laudable pursuits, and probably as profitable as raising and smelting ore; but they were foreign to the purposes for which the corporation was created, and obviously not necessary to carry them into effect. This is indeed conceded by the learned judge who delivered the opinion in Moss against the company, (5 *Hill,* 137,) which was adopted by the court below in this case. He however, to justify this purchase of property, which to use his language, "in the abstract did not

come within the corporate powers of the defendants," says, "It seems the vendors were not willing to except any thing, and the defendants took the whole; and we must, if necessary, intend this was so on the presumption that they would not wilfully transgress their powers. It might therefore be inferred that they purchased the extra land, if any, the school house, thresh-ing machine, &c. as a *sine qua non* to a bargain, which on the whole was valuable and pertinent to their business." "This," he adds, "they had a right to do." To this doctrine I cannot yield my assent. No inference can be made in favor of a body of limited powers, and it can afford no justification for an unau-thorized or illegal act, that a lawful object could not be other-wise attained. Individual stockholders, on becoming subscribers to the stock of a corporation, are apprized by its charter of the powers conferred upon its agents. These cannot be trans-cended by any considerations of expediency which they suppose may result to the stockholders from an act not within the scope of their authority. The relative rights of a corporation and its stockholders were considered in the case of the *Hartford and New-Haven Rail-Road Company* v. *Croswell*, (5 *Hill*, 383.) It was there held that " no radical change or alteration can be made or allowed, by which new and additional objects are to be accomplished or responsibilites incurred by the company so as to bind the individuals composing it without their assent." (*p.* 386.) The same rule was applied by Chancellor Kent to a private association, in *Livingston* v. *Lynch*, (4 *John. Ch. Rep.* 573,) above cited. The principle is a sound one, and appears to me conclusive on the main question in this case. It appears that the proprietor of the mining lands at Rossie gave leases of separate portions thereof to different individuals on which sep-arate associations located. The Rossie Lead Mining Company held one; the Rossie Galena Company, incorporated at the same time, (*Laws* 1837, *p.* 445,) held another; and Moss and Knapp a third one; which latter was assigned to the Rossie Lead Mining Company as part of the consideration of the note in question. If instead of this lease, the rights of the " *Galena* Company" had been purchased, I presume it would not have

been contended that it was within the corporate powers. But there is no difference in principle between the cases. There are other provisions of the contract which appear exceptionable. The power of smelting lead was, as it appears to me, clearly intended to be of such only as the company raised. It could not therefore assume the contract with Parish. The undertaking to carry out the stipulations of Moss and Knapp's contract with Fitzhugh and Vandewater also seems to me to have been unauthorized.

There is another objection taken on the trial which I will briefly notice. It relates to the proof given to show that the account rendered for damages under the smelting contract did not form a part of the consideration of $15,000 for which in part the note in question was given. The relinquishment of mutual claims by one party against the other appears in the agreement itself to have entered into the consideration therefor. And although it may not, as Chief Justice Nelson says, have formed " a part of the purchase money of the *property sold and delivered* to the company," yet it does not follow that it did not constitute a part of the sum agreed to be paid by the company. It is true one of the partners of Moss & Knapp swears that the claim was thrown in although he considered it justly due, but that does not prove that the company would have paid the amount agreed on if that account had not been settled. Indeed it appears in the letter of Judson, that but for certain circumstances said to have been mentioned by Moss to him he would not have consented to give more than $12,500 ; but what the circumstances are is not stated. The claim amounted to more than $10,000. It does not appear, however, what the counter claims of the company were, and I have discovered no evidence to warrant the remark of the learned judge, so far at least as relates to the company, " that these claims were mutu ally given up and cancelled without being taken into the ac count in putting a valuation on the property." But whatever may have been the fact, it was not competent by parol testimony to show that the account formed no part of the consideration for the note in question. A written instrument cannot be

contradicted nor explained in this manner. If however it be conceded, as the learned chief justice says, that " the evidence in no way contradicted the written instrument, but was entirely consistent with every part of it," yet the circuit judge could not decide, as a matter of law, that the account did not enter into the consideration. That was a question for the determination of the jury. The contract out of which it arose was entered into before the defendant became a stockholder, and he could not be held responsible for any right accruing under it. The plaintiff, as endorsee of the note, stands in the same situation as the payees. He took it of them as a security for an antecedent debt, and of course subject to all equities between the original parties. He was moreover bound to know that the company was limited in its powers, and he cannot therefore in any way be considered a bona fide purchaser without notice. The sale of a part of the property assigned by the agreement to the company, by an execution, and of the balance by a receiver, occurred after the defendant ceased to be a stockholder, and could not affect his rights. It could not, indeed, under any circumstances, have made the original transaction valid. The rule on this subject was properly laid down by Justice Jewett, in *Hodge's* v. *The City of Buffalo,* (2 *Denio,* 110,) in which he says, "It cannot be maintained that a corporation can by a subsequent ratification make good an act of its agent which it could not have directly empowered him to do."

If these views are correct, the judgment of the supreme court is erroneous and must be reversed, and a *venire de novo* awarded.

PUTNAM, Senator, delivered a written opinion, maintaining the same views, except in relation to the time when a stockholder of the corporation was bound individually for its debts. Upon this point his opinion was as follows:

By the 9th section of the charter " the stockholders of the said corporation shall be jointly and severally personally liable for the payment of all debts or demands contracted by the said corporation, or their authorized agent or agents, and any person

McCullough *v.* Moss.

having any demand against the said corporation may sue any stockholder, director or directors, in any court having cognizance thereof, and recover the same with costs." The personal liability, if any, arises solely under this section. So far as I have been able to discover this question is now for the first time raised in this court. It is not, however, a new question. In Connecticut, the judges under a similar statute, have entertained opposite or different opinions as to the time the liability attaches. Our supreme court, in the case of *Moss* v. *Oakley*, (2 *Hill*, 265,) under this same charter decided that only those who were stockholders when the debt was contracted, were liable. If the principle laid down by the court in that case is a fair and correct construction of the statute, then the decision should be conclusive upon this court: otherwise not. The first branch of the section makes the stockholders liable for the debts contracted. The other branch gives the remedy by suit against any stockholder, director or directors, in favor of any person having a demand. In determining the liability with reference to the time when it accrued, Justice Bronson was not free from difficulty, for he says: " I do not, however, intend to lay much stress upon the particular wording of the section, for it must be admitted that the statute may be so construed without doing any violence to the language as to make it apply to those who were stockholders at the time the suit is commenced." He disregarded the language of the section, which he admits may not refer to the stockholders *when the suit is·commenced;* and taking his view of the question from the nature of the case and the general scope of the act, he comes to the conclusion that the liability refers to the stockholders who were such when the debt was made. When the intention of the legislature is plainly manifested in the language of a statute, and the object intended in the passage of the act, is attained, I know of no warrant or authority to look at the general scope of the act to determine its construction. What did the legislature intend by the section in question? The answer is plain : the intention is obvious. A personal liability of the stockholder, which is as absolutely obtained by the construction which the justice says

may be given to the section, as in that settled upon by him, and arrived at by looking at the whole statute.   Now each section of a statute must be construed by itself, and not borrow aid from other portions of the act, provided it is susceptible of such a construction as will be consistent with the general provisions of the act.   If we apply these rules to the section before us, we have no difficulty.   It creates a personal liability, but *when* that attaches to the stockholder, the section does not determine. The supreme court infers or construes the statute to mean the time when the debt was created.   Such an inference, I think, is not borne out by the language of the section.   I repeat that the first branch of the section merely establishes the personal liability.   The next branch declares that, " any person having any demand against the said corporation may sue."   And who may be sued ?   " Any stockholder," is the answer given in the statute language; clearly referring to the time of the commencement of the suit, and thereby designating who is to be sued.   He must be a stockholder *when the suit is commenced.* Now the liability and the person to be sued are clearly fixed. If the legislature intended that an old stockholder, or one who was so when the debt was created, might be sued, they would have said so, as they have in other charters.   When there is difficulty in arriving at the construction of a statute, it is proper to take into view, the general system of legislation upon like subjects in order to aid in its construction.   (3 *Mass.* 17, 21 ; 1 *Pick.* 248.)   The act in relation to the Oriskany Manufacturing Company, (*Laws of* 1844, *p.* 34,) after fixing the personal liability clause adds, " to be recovered of the stockholders who are such when the debt is contracted, or of any subsequent stockholder."   The charter of the Buffalo Gas-light Company, (*Laws of* 1845, *p.* 277,) has precisely the same language.   And where a different period or principle determines the liability, we find the legislature is particular in the language used, admitting of no doubt as to its construction.   In the act relative to " manufacturing incorporations," passed in 1811, the personal liability clause is incorporated in the following language: " and that for all debts which shall be due, and owing by the

McCullough v. Moss.

company at the time of its dissolution, the persons, then composing such company, shall be individually responsible to the extent of their respective shares of stock." The time when the debt was contracted was not the time fixed, nor was the time when the suit should be commenced, but the time of dissolution. Precisely the same language is used in the act to incorporate the Ballston Spa Manufacturing Company. (Laws of 1836, ch. 193.) The persons composing the company at the time of its dissolution, are made liable. I venture to say that every charter containing the personal liability clause, fixes by its terms the principle, and in language not to be mistaken. In two of the instances cited, those who are stockholders when the debt is created, are made liable, and in two other cases those at the dissolution of the corporation. In the case before us, I deem the language equally as decisive, referrring as it does to the time when the suit is commenced. Looking then to the history of legislation upon the subject, going back to 1811, and coming down to the present time, we see that the language has been precise and definite, evincing much caution as to the terms used and leaving nothing in uncertainty to be determined or guessed out by our courts of justice. It seems to me that in the case before us the words of the statute are too plain to be misunderstood. They speak for themselves, and make the stockholders liable who hold stock when the suit is commenced. Without any qualifying language, the words, may sue any stockholder, must necessarily refer to the time when the suit is brought. A stockholder is to be sued; not one who was a stockholder. If correct in my view of the section, the plaintiff below had no cause of action against the defendant, as he had parted with his stock before the suit was commenced.

VAN SCHOONHOVEN, Senator, delivered an oral opinion in favor of reversal, expressing views similar to those contained in the opinion of Senator LOTT.

BARLOW and TALCOTT, Senators, delivered written opinions in favor of affirming the judgment, for reasons substantially the

same upon which the cause was decided by the supreme court, and holding that those who were stockholders when the debt of the corporation was contracted, were contemplated in the personal liability clause in the act of incorporation.

GARDINER, President, delivered a written opinion in favor of affirmance.

On the question being put, *"Shall this judgment be reversed?"* the members of the court voted as follows:

*For reversal:* The PRESIDENT, and *Senators* BACKUS, DEYO, EMMONS, HARD, LOTT, PORTER, PUTNAM, SANFORD, J. B. SMITH, VAN SCHOONHOVEN—11.

*For affirmance: Senators* BARLOW, BURNHAM, JONES, SCOVIL, SEDGWICK, S. SMITH, TALCOTT, WHEELER—8.

Judgment reversed.